Slip Op. 19-57

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **AERO RUBBER COMPANY, INC.,**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>          **Defendant.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 15-00174**<br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Granting in part and denying in part both Defendant's motion for summary judgment and Plaintiff's cross-motion for summary judgment.]

Dated: May 14, 2019

<u>William Dell Outman, II</u>, of Chevy Chase, Maryland argued for the Plaintiff, Aero Rubber Company, Inc.

<u>Edward Francis Kenny</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, New York, argued for the Defendant, the United States. With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, and <u>Amy M. Rubin</u>, Assistant Director. Of Counsel on the brief was <u>Yelena Slepak</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Kelly, Judge:  This action concerns the classification of an assortment of molded silicone bands that are larger than wrist size and contain some form of printed wording or motif.  Compl. ¶ 8, Sept. 15, 2015, ECF No. 8 ("Compl."); Def.'s Statement of Undisputed Material Facts ¶¶ 2, 27, Dec. 26, 2017, ECF No. 52 ("Def.'s 56.3 Statement").[1]

---

[1] Plaintiff did not submit a statement of undisputed facts with its summary judgment motion pursuant to Rule 56.3 of the Rules of the United States Court of International Trade. Rather, in its response to Defendant's summary judgment motion, Plaintiff stated that it "agree[s] generally"

(footnote continued)

Defendant, the United States, moves for summary judgment, requesting that the court find as a matter of law that Plaintiff's imports were properly classified within subheading 3926.90.99, Harmonized Tariff Schedule of the United States (2013) ("HTSUS"),[2] by U.S. Customs and Border Protection ("CBP").  Def.'s Mot. Summary J., Dec. 22, 2017, ECF No. 45; Mem. Supp. Def.'s Mot. Summary J. at 1, Dec. 22, 2017, ECF No. 45 ("Def.'s Br.").  Plaintiff, Aero Rubber Company, Inc., opposes the motion and cross-moves for summary judgment, requesting that the court find as a matter of law that the imports are properly classifiable within subheading 4911.99.80, HTSUS.  See Compl. ¶ 8; Pl.'s Mot. Summary J., Jan. 29, 2019, ECF No. 53; Pl.'s Mem. Opp'n Def.'s Mot. Summary J. & Supp. Pl.'s Cross-Mot. Summary J. at 17, Jan. 29, 2018, ECF No. 53 ("Pl.'s Br.").  For the reasons that follow, both motions are granted in part and denied in part.

## BACKGROUND

Plaintiff designs and produces customized rubber products, including molded and rolled sheet rubber, extruded rubber products of various elasticities, rubber bands, "PromoStretch" silicone bands, and wristbands.  Def.'s 56.3 Statement ¶ 1.  At issue in

---

with the facts as represented by Defendant's 56.3 Statement and submitted several clarifications and additions.  See Pl.'s Statement of Undisputed Material Facts, Jan. 29, 2018, ECF No. 53 ("Pl.'s 56.3 Statement").  Unless otherwise specified, citations to Defendant's 56.3 Statement are to facts on which the parties have agreed.  Because both parties agree that summary judgment is proper and there are no disputed facts, the court treats Plaintiff's clarifications and additions as undisputed, and notes where the court relies on them.  See Oral Arg. at 01:15:25–01:16:12 (Defendant acknowledging that no facts are in dispute); see also Oral Arg. at 01:20:20–01:21:23 (Plaintiff arguing that summary judgment should be applied).

[2] All references to the HTSUS refer to the 2014 edition, the most recent version of the HTSUS in effect at the time of the last entries of subject merchandise.  See Def.'s 56.3 Statement ¶ 3.  The 2013 edition of the HTSUS, in effect at the beginning of the period during which entries of subject merchandise were made, is the same in relevant part as the 2014 edition.

this case is the proper classification of ten customized PromoStretch silicone bands, each larger than wristband size and containing some printed wording or motif.  Def.'s Br. at 7–12; Def.'s 56.3 Statement ¶ 27.[3]  The silicone bands are nearly as elastic as a natural rubber band, highly durable, and considered to be of a higher quality than natural rubber bands.  Def.'s 56.3 Statement ¶¶ 16–17.  The individual bands are discussed in greater detail below.

CBP classified and liquidated the subject entries under subheading 3926.90.99, HTSUS, which covers: "Other articles of plastics and articles of other materials of headings 3901 to 3914: Other: Other," dutiable at 5.3 percent <u>ad valorem</u>.  Def.'s 56.3 Statement ¶ 3.  Plaintiff timely filed administrative protests[4] challenging CBP's classification determination, asserting that the bands are properly classifiable under subheading 4911.99.80, HTSUS.[5]  Subheading 4911.99.80, HTSUS, covers "Other

---

[3] Although the entries summonsed in this action include 41 different silicone bands, only ten bands remain subject to a classification dispute.  Def.'s 56.3 Statement ¶¶ 18–27.

[4] Plaintiff filed protest numbers 3195-14-100229 and 2809-14-100802.  CBP denied protest number 3195-14-100229 in full on December 22, 2014 and denied protest number 2809-14-100802 in part on March 6, 2015.  <u>See</u> 3195-14-100229 Determination [attached as Def.'s Ex. 1] at 2, Dec. 22, 2014, ECF No. 49; 2809-14-100802 Determination [attached as Def.'s Ex. 1] at 48, Mar. 6, 2015, ECF No. 49.  The aspect of protest number 2809-14-100802 that CBP approved is not relevant to the dispute at hand.  <u>See id.</u> at 48 (stating that "[t]humb, finger and wristbands classification changed per HQ 236523").

[5] In Plaintiff's protest, it asserted that the various silicone bands fall into three different categories for classification purposes, the second of which is relevant to the current action:

> (a) All thumb, finger and wrist bands, whether printed or plain, are properly classifiable under subheading 7117.90.75, HTSUS as imitation jewelry, or plastic.

(footnote continued)

printed matter, including printed pictures and photographs: Other, Other."  CBP denied

Plaintiff's protests in relevant part.  <u>See</u> Protest No. 3195-14-100229 Determination

[attached as Def.'s Ex. 1 at 2], Dec. 22, 2014, ECF No. 49; Protest No. 2809-14-100802

Determination [attached as Def.'s Ex. 1 at 48], Mar. 6, 2015, ECF No. 49.

Plaintiff commenced this action to contest CBP's denial of its protests.[6]  <u>See</u>

Summons, June 22, 2015, ECF No. 1; Compl.  Plaintiff contends that the printed silicone

bands in dispute were improperly classified under subheading 3926.90.99, HTSUS, and

are instead properly classifiable as "Other Printed Matter" under subheading 4911.99.80,

HTSUS.  <u>See</u> Compl. ¶ 8.  Plaintiff asserts that printed silicone bands in question "consist

of articles of plastic," "have been printed with motifs, characters, or pictorial

---

(b) All printed, etched and embossed silicone rubber bands, other than those
suitable for wear on the wrist, thumb or finger, are properly classifiable as
"Other printed matter" under subheading 4911.99.80, HTSUS[.]

(c) All plain (i.e. not printed, etched or embossed) silicone rubber bands, other
than those suitable for use as imitation jewelry, are classifiable as other articles
of plastic under subheading 3926.90.99, HTSUS.

Schedule B to Protest No. 3195-14-100229 [attached as Def.'s Ex. 1] at 5, Dec. 16, 2014, ECF
No. 49.  The parties agree that silicone bands with a circumference suitable for wearing around
the wrist or on a finger or thumb are properly classifiable under subheading 7117.90.75, HTSUS,
as imitation jewelry, of plastic.  Compl. ¶ 6.  Further, the parties agree that the plain, unprinted
silicone bands with circumferences not suitable for wearing on the wrist, thumb or finger are
properly classifiable under subheading 3926.90.99 as other articles of plastic.  Compl. ¶ 7.  Of the
41 separate silicone bands, <u>see</u> Def.'s 56.3 Statement ¶ 21, ten are the subject of dispute in the
current action: production orders Q2201, P9427, P9938, Q1320, Q1004, Q2372, Q2287, Q3712,
Q3613, and Q3695.  <u>Id.</u> ¶ 27.  These entries have circumferences ranging from 215.5 millimeters
to 609.6 millimeters, which constitute sizes larger than would be suitable to wear around the wrist.
<u>See</u> Entry Diagrams [attached as Def.'s Ex. 3] at 10, 13, 17, 21, 25–27, 35, 37, and 40; Def.'s
56.3 Statement ¶ 27.

[6] The present action was reassigned on January 9, 2019.  <u>See</u> Order of Reassignment, Jan. 9,
2019, ECF No. 77.  The court ruled on Defendant's motion to strike on January 29, 2019, <u>see</u>
<u>Aero Rubber Co., Inc. v. United States</u>, 43 CIT __, Slip Op. 19-14 (Jan. 29, 2019), and held oral
argument on March 12, 2019.  <u>See</u> Appearance Sheet, Mar. 12, 2019, ECF No. 85.

representations," and "have printed motifs, characters or pictorials representations that are not merely incidental to the primary use of the Printed Silicone Bands." Compl. ¶ 9. Plaintiff maintains that the printing on the silicone bands is the reason the bands are produced in the first place. Compl. ¶ 13. Defendant responds that the printed silicone bands were properly classified under subheading 3926.90.99, HTSUS, because the printing on these bands "is incidental to the bands' essential nature and use in binding, bundling, securing, and gripping." Def.'s Br. at 15.

### JURISDICTION AND STANDARD OF REVIEW

The court has "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930, [as amended, 19 U.S.C. § 1515 (2012)]," 28 U.S.C. § 1581(a) (2012), and reviews such actions de novo. 28 U.S.C. § 2640(a)(1) (2012). The court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).

### DISCUSSION

Classification involves two steps. First, the court determines the proper meaning of the tariff provisions, which is a question of law. See Link Snacks, Inc. v. United States, 742 F.3d 962, 965 (Fed. Cir. 2014). Second, the court determines whether the subject merchandise falls within the scope of the tariff provision, which is a question of fact. Id. Where there is no dispute regarding the nature of the merchandise, "the two-step classification analysis 'collapses entirely into a question of law.'" Id. at 965–66 (quoting Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed. Cir. 2006)). The court must

determine "whether the government's classification is correct, both independently and in

comparison with the importer's alternative." Jarvis Clark Co. v. United States, 733 F.2d

873, 878 (Fed. Cir. 1984).

### A. The Meaning of the Relevant Tariff Terms

Customs classification is governed by the General Rules of Interpretation ("GRIs")

and the Additional U.S. Rules of Interpretation. See Roche Vitamins, Inc. v. United

States, 772 F.3d 728, 730 (Fed. Cir. 2014). The court applies the GRIs in numerical order

beginning with GRI 1, and the court will only reach subsequent GRIs if analysis under the

preceding GRI does not yield proper classification of the subject merchandise. See Link

Snacks, Inc., 742 F.3d at 965; Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379

(Fed. Cir. 1999). GRI 1 provides that "classification shall be determined according to the

terms of the headings and any relative section or chapter notes." The chapter notes

include the Additional U.S. Notes, which are part of the legal text of the HTSUS, and "are

'considered to be statutory provisions of law for all purposes.'" See HTSUS, Preface at

1 n.2; Del Monte Corp. v. United States, 730 F.3d 1352, 1355 (Fed. Cir. 2013) (quoting

What Every Member of the Trade Community Should Know About: Tariff Classification

32 (U.S. Customs & Border Prot. May 2004).

The terms of the HTSUS are "construed according to their common and

commercial meanings, which are presumed to be the same." Carl Zeiss, Inc, 195 F.3d at

1379 (citing Simod Am. Corp. v. United States, 872 F.2d 1572, 1576 (Fed. Cir. 1989)).

The court defines HTSUS tariff terms by relying on its own understanding of the terms

and "may consult lexicographic and scientific authorities, dictionaries, and other reliable

information sources." Carl Zeiss, Inc., 195 F.3d at 1379 (citation omitted). The court may

also consult the Harmonized Commodity Description and Coding System's Explanatory

Notes ("Explanatory Notes") to help construe the various HTSUS provisions. See

StoreWALL, LLC v. United States, 644 F.3d 1358, 1363 (Fed. Cir. 2011). Although the

"Explanatory Notes are not legally binding, [they] may be consulted for guidance and are

generally indicative of the proper interpretation of a tariff provision." Roche Vitamins, 772

F.3d at 731.

HTSUS subheading 3926.90.99, under which CBP classified and liquidated

Plaintiff's merchandise,[7] covers: "Other articles of plastics and articles of other materials

of headings 3901 to 3914: Other: Other."[8] Note 2 to Section VII, which includes Chapter

39, HTSUS, provides that

> Except for the goods of heading 3918 or 3919, plastics, rubber and articles
> thereof, printed with motifs, characters or pictorial representations, which
> are not merely incidental to the primary use of the goods, fall in chapter 49.

Here, proper classification of the merchandise turns on whether the printed motifs,

characters, or pictorial representations on the silicone bands are "not merely incidental to

---

[7] Plaintiff agrees that its silicone bands that do not contain printing and are of a size unsuitable
for wear on the wrist, thumb, or finger are classifiable under subheading 3926.90.99, HTSUS.
Compl. ¶ 7; Def.'s 56.3 Statement ¶ 20.

[8] The Chapter Notes to Chapter 39, HTSUS, (Plastics and Articles Thereof) provide that:

> Throughout the tariff schedule the expression "plastics" means those materials of
> headings 3901 to 3914 which are or have been capable, either at the moment of
> polymerization or at some subsequent stage, of being formed under external
> influence (usually heat and pressure, if necessary with a solvent or plasticizer) by
> molding, casting, extruding, rolling or other process into shapes which are retained
> on the removal of the external influence.

Chapter Note 1 to Chapter 39. Plaintiff produces its silicone bands by using a molding
process, during which heat and pressure are applied. Def.'s 56.3 Statement ¶¶ 7, 11.

the primary use of the goods."  If the printing is merely incidental to the primary use of the goods, then the goods are properly classifiable as other articles of plastic under subheading 3926.90.99, HTSUS.  If, on the other hand, the printing is not merely incidental to the primary use of the goods, then the goods should be classified as "Other printed matter" under subheading 4911.99.80, HTSUS.

The court first construes the words of the tariff to discern its meaning.  The relevant language of Note 2 to Section VII presupposes that the subject goods will have a function, and that to fall under Chapter 49, the printing will be more than merely incidental in relation to that function.  The words "to the primary use" in Note 2 link the "incidental" inquiry to the function of the goods.  To fall under Chapter 49, HTSUS, the printing may be the primary function or use of the goods, or it may be something less than, or subordinate to, that primary use, but it cannot be merely incidental to that primary use.  Thus, the court construes the tariff provisions in this context.

Printing that is "not merely incidental to the primary use of the goods" as referenced in Note 2 means any printing that is not of minor importance or not unimportant in relation to something else.  Indeed, "incidental" means something of lesser or secondary importance, or a minor accompaniment.  See, e.g., The Oxford English Dictionary 794 (J.A. Simpson & E.S.C. Weiner eds., 2nd Ed. 1989) (Incidental: A. adj. 1. a. Occurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part; casual); The American Heritage Dictionary of the English Language 912 (Houghton Mifflin Co. 3rd Ed. 1996) (Incidental: 1. Occurring or likely to occur as an unpredictable or minor accompaniment. 2. Of a minor, casual, or subordinate

nature: <u>incidental expenses</u>.); <u>Shorter Oxford English Dictionary</u> 1350 (Oxford University Press 6th Ed. 2007) (<u>Incidental</u>: 1. Liable to happen to; naturally attaching <u>to</u>. 2. Occurring as something casual or of secondary importance; not directly relevant <u>to</u>; following (<u>up</u>)<u>on</u> as a subordinate circumstance.) (emphasis in original); <u>Webster's Third New Int'l Dictionary</u> 1142 (Philip Babcock Gove, Ph. D. & Merriam-Webster Editorial Staff eds., 2002) (<u>Incidental</u>: subordinate, nonessential, or attendant in position or significance . . . .).  These definitions convey both that an incidental happening is one that has a relationship to something else ("subordinate" or "in conjunction" or "attaching to") and that, in comparison, its significance is minor ("minor" or "nonessential").[9]

Printing in the context of Chapter 49 is of minor importance or unimportant when it does not relate to the essence of the product.  Heading 4911, HTSUS encompasses "Other printed matter," a phrase that is broad.  Note 2, however, limits the heading by

---

[9] Plaintiff provides several definitions of incidental. First, "1. Occurring or likely to occur as an unpredictable or minor accompaniment. 2. Of a minor, casual, or subordinate nature: <u>incidental expenses</u>.  <u>See</u> Pl.'s Br. at 20 (citing <u>American Heritage College dic-tion-ar-y</u>, 4th Ed. 2002). Second, Plaintiff offers "1. Happening or likely to happen in an unplanned or subordinate conjunction with something else. 2. Incurred casually and in addition to the regular or main amount: <u>incidental expenses</u>." <u>Id.</u> at 20 (citing <u>Webster's Encyclopedic Unabridged Dictionary of the English Language</u>, 1996 Ed).  Third, Plaintiff offers "1. being likely to ensue as a chance or minor consequence 2. Occurring merely by chance or without intention or calculation." <u>Id.</u> at 20–21   (citing   the   <u>Merriam   Webster   Dictionary</u>,   available   at www.merriamwebster.com/dictionary/incidental?src=search-dict-box (last visited May 9, 2019)). Finally, Plaintiff suggests "1 : occurring merely by chance or without intention or calculation 2: being likely to ensue as a chance or minor consequence." <u>Id.</u> at 21 (citing <u>Webster's New Collegiate Dictionary</u>, 1976 Ed)).  To the extent that Plaintiff's proffered definitions indicate that "not merely incidental" includes situations where the printing component is of minor importance or unimportant in relation to something else, the court agrees with Plaintiff's position.  <u>See</u> Pl.'s Br. at 21.  To the extent that these definitions also suggest incidental means "accidental" or "unplanned", clearly such a definition could not apply in the context of Chapter 49.  Chapter 49 pertains to printed articles.  Surely Congress, by including the phrase "not merely incidental to" in Note 2 to Section VII, were not attempting to classify printing mishaps.  Such an interpretation is overly restrictive and does not align with a reasonable interpretation of the tariff terms.

excluding printed matter where the printing is merely incidental (or of minor importance relative to something else).  The General Explanatory Note to Chapter 49 clarifies what would be considered of minor importance relative to something, providing that, save for a few exceptions not relevant here, Chapter 49 "covers all printed matter of which the essential nature and use is determined by the fact of its being printed with motifs, characters or pictorial representations."  Therefore, only printing that is non-essential in nature should be excluded from Chapter 49.  Essential means relating to the essence of a product, necessary, something basic.  See Webster's Third New International Dictionary 777 (Philip Babcock Gove, Ph. D. & the Merriam-Webster Editorial Staff eds., Unabridged 2002) (Essential: 1: of or relating to an essence: as **a**: having or realizing in itself the essence of its kind: having or consisting of the basic, most fundamental nature, property, quality, or attribute peculiar to or necessary or indispensable to its kind. **b**: forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing); Shorter Oxford English Dictionary 865 (Oxford Univ. Press 6th Ed. 2007) (Essential: 1. That is such in absolute or highest sense. 2. Of or pertaining to a thing's essence).  Therefore, if the printing does not relate to the essence of the product, then the product cannot be classified under Chapter 49.

Where printing has a communicative purpose, the printing comprises part of the essence of the product.  Indeed, where a product's printing has a communicative purpose, one can reasonably surmise that the product as a whole is intended to carry out that communicative purpose.  Logically, a communicative printed component is meant to transfer information.  The product is the medium for the message, regardless of what

other purpose it might have.  Whatever the other functions of the product, the printed component becomes part of the essential nature of the product.  The product not only serves whatever utilitarian function it may have, it also carries the message of the printing upon it to its recipient.

Conversely, printing that is merely decorative—and thus lacks a communicative purpose—would not form part of the essence of a product.  The General Explanatory Note to Chapter 49 also uses the term "merely incidental" in describing Chapter 49's exclusions, stating that

> On the other hand, besides the goods of heading 48.14 or 48.21, paper, paperboard or cellulose wadding, or articles thereof, in which the printing is merely incidental to their primary use (e.g., printed wrapping paper and printed stationery) fall in Chapter 48.

General Explanatory Note Chapter 49.  These examples describe printing that may be aesthetically pleasing, but not communicative.  The printed wrapping paper and printed stationery examples make clear that a printed component that is merely decorative—and does not serve any purpose beyond aesthetics—should be considered incidental to the primary use.  In the wrapping paper example, the primary use would be wrapping a gift, while in the stationery example, the primary use would be writing on the stationery.

Defendant argues that dictionary definitions for the word "incidental" support its view that for merchandise to be classified under Chapter 49, "the printing on the silicone bands has to be of greater importance than the functional uses of the bands."  Def.'s Br. at 19.  The definitions Defendant invokes do not support this view; although they establish that something incidental is less important, they do not specify the extent to which

something must carry less importance.  <u>See</u> Def. Br. at 18–19 (citing <u>The Cambridge Academic Content Dictionary</u>, <u>available at</u> https://dictionary.cambridge.org/us/dictionary/english/incidental (last visited May 9, 2019) ("Happening by chance, or in connection with something of greater importance.")), 19 (citing <u>The Collins COBUILD Advanced English Dictionary</u>, <u>available at</u> https://collinsdictionary.com/us/dictionary/english/incidental (last visited May 9, 2019) ("If one thing is incidental to another, it is less important than the other thing or is not a major part of it."), 19 (citing <u>The MacMillan Dictionary</u>, <u>available at</u> https://www.macmillandictionary.com/us/dictionary/american/incidental_1 (last visited May 9, 2019) ("Related to something but considered less important.").  All the definitions cited by the Defendant explain "incidental" as less important, similar to the definitions proffered by Plaintiff and found by the court.  Defendant's suggestion that incidental includes anything the slightest bit less important than the primary use, however, is unfounded.  <u>See</u> Def.'s Br. at 19.  In fact, the definitions Defendant invokes include such language as "happening by chance" or "not a major part of it."  These words suggest that incidental means not just less important, but minor.  Certainly, nothing in these definitions suggests that incidental includes everything but the primary use.

Moreover, had Congress intended "merely incidental" to mean simply not the primary use, it could have said so expressly.  Specifically, Note 2 could have read: "plastics, rubber and articles thereof, articles with motifs, characters or pictorial representations, which are not less important than the primary use of the goods, fall in chapter 49."  Congress did not draft Note 2 as such.  Instead, Congress adopted the

phrasing "not merely incidental to," suggesting something more nuanced than a simple

weighing of importance.

Defendant also seems to argue that where the merchandise serves a utilitarian

function, that function constitutes the essential nature, regardless of what the printing

conveys.  <u>See</u> Def.'s Br. at 15.  Defendant's view of the General Explanatory Note to

Chapter 49 is overly narrow.  Where a product's printing component has a communicative

purpose—even concurrently with a utilitarian function—its essence is more complex than

Defendant suggests.  Moreover, Defendant's interpretation of the General Explanatory

Note would risk reading the Explanatory Notes in a manner that conflicts with the plain

language of the tariff provision, a practice against which the Court of Appeals for the

Federal Circuit has cautioned.  <u>See</u> <u>StoreWALL, LLC</u>, 644 F. 3d at 1363 (citing <u>Airflow</u>

<u>Tech., Inc. v. United States</u>, 524 F. 3d 1287, 1293 (Fed. Cir. 2008)).  The General

Explanatory Note merely states that the chapter covers printed matter "of which the

essential nature and use is determined by the fact of its being printed."  It does not state

that wherever a product also serves a utilitarian function, printing may not constitute part

of that product's essence, and the court will not read it as such.  Defendant's construction

of the Explanatory Note is thus unavailing.[10]

The dispositive factor is therefore whether the printing component has a

communicative purpose.  Where the printing component is designed to communicate

---

[10] If the essence of all bands with printing were merely binding, bundling, securing, and gripping, as Defendant suggests, <u>see</u> Def.'s Br. at 15, it is hard to see why purchasers would incur the additional costs over and above buying simple rubber bands.

information, it cannot be considered merely incidental to the primary use of the goods and should therefore be classified under Chapter 49.  Such a reading is consistent with the meaning of the tariff terms and the language of the General Explanatory Note to Chapter 49 and the examples provided.  Unlike a printed component that is merely decorative, such as that of wrapping paper or stationery, one that is designed to have a communicative purpose carries greater importance than something that could reasonably be considered merely incidental.

### B.  The Merchandise at Issue

There is no dispute as to the nature of the subject merchandise.  As described, the articles in dispute consist of ten different kinds of silicone bands, each larger than wristband size, and each containing some form of printed wording or motif.  Compl. ¶ 8; Def.'s 56.3 Statement ¶ 27.  The court considers each individual band in turn.

### 1.  Production Order Q2201

Production Order Q2201 consists of black silicone bands that are 279 millimeters ("mm") in circumference, 15.24 mm wide.  Def.'s 56.3 Statement ¶ 29.  The bands were ordered by a furniture company to bind together a stack of two to six heavy cardstock cards without making the cards buckle under the tension of the bands, while also displaying the company's logo as large as possible on both sides of the band.  Def.'s 56.3 Statement [as clarified by Pl.'s Statement of Undisputed Material Facts, Jan. 29, 2018, ECF No. 53 ("Pl.'s 56.3 Statement")] ¶¶ 28, 30.  The bands are imprinted with the company's logo, which consists of a square with the company's initials appearing inside

the square, separated by a diagonal line.[11] See Entry Diagrams [attached as Def.'s Ex.
3] at 10, Dec. 23, 2017, ECF No. 49-1.

Here, the printing component is not merely incidental to the bands' primary use.
The bands are customized such that the company's logo and initials appear twice on the
outside of the cardstock cards.  Further, the logo is printed as large as possible on the
bands and spaced such that it may appear on both sides of the cards.  See Entry
Diagrams [attached as Ex. 3] at 10, Dec. 23, 2017, ECF No. 49-1.  The printing has a
communicative purpose because it alerts whomever sees the bands to the fact that the
cards pertain to the relevant company.  Although the bands have a dual purpose—to bind
the cards and to communicate a message—the printing of the company's logo and initials
is not merely incidental to the bands' primary use.  The court need not decide which use
is primary; it suffices that the printing component has a communicative purpose and is
thus not merely incidental.

### 2.  Production Order P9427

Production Order P9427 consists of red silicone bands that are 348 mm in
circumference and 25.4 mm wide.  Def.'s 56.3 Statement ¶¶ 31–32.  The bands were
ordered by a designer, manufacturer, and service provider of control solutions for the
aerospace and industrial markets.[12] Id. ¶ 31.  The bands are imprinted with the words
"REMOVE BEFORE INSTALLATION" in white lettering, and the company uses the bands

---

[11] The company is [[                    ]], and the bands contain a square with the initials [[   ]] and [[
  ]] inside the square, separate by a diagonal line.  See Entry Diagrams [attached as Def.'s Ex.
3] at 10, Dec. 23, 2017, ECF No. 49-1.

[12] The company that ordered these bands is [[                              ]].  Def.'s Br. at 8.

to cover and protect certain aspects of its product during shipment, prior to installation. Id. ¶ 33.  The sizes were custom-ordered to ensure the bands would fit on the part to be protected during shipment, and the red color was designed to call the buyer's attention to the bands' placement.  Id. ¶ 34.

The printing on these silicone bands is not merely incidental to the products' primary use.  Again, the bands in question serve two purposes—to secure certain aspects of the product during shipment, and to convey information.  Nevertheless, the printing component has a communicative purpose that cannot be ignored. The bands' red color— and contrasting white lettering—draw the user's attention to the bands' message, i.e., stop and remove prior to installing, thus underscoring the importance of the message being adequately conveyed.  Def.'s 56.3 Statement [as clarified by Pl.'s 56.3 Statement] ¶ 34.  Indeed, it is critical that the band be removed prior to installation.  See Def.'s 56.3 Statement  ¶¶ 33–34 (noting that the band covers and protects parts of the product prior to installation and that the red color assists in calling user's attention to the band's placement); see also Deposition Testimony of Paul G. Berlin, Sr. [attached as Def.'s Ex. 5] at 53, Aug. 2, 2017, ECF No. 49-2 ("Berlin Testimony") (noting that the bands convey the critical information to the customer that the bands should be removed prior to installation).  Accordingly, the printing component for Production Order P9427 is not merely incidental to the article's primary use.

### 3.  Production Order P9938

Production Order P9938 consists of red silicone bands that are 609.6 mm in circumference and 25.4 mm wide.  Def.'s 56.3 Statement ¶ 36.  The bands were ordered

by a video game accessory company to hold together a seasonal special-offer bundle containing gaming accessories and a game product sold through a gaming store.[13]  Id. ¶ 38.  The bands are imprinted with the store's name and slogan in black and white lettering, and their red color was selected to match the store's logo.[14]  Id. [as clarified by Pl.'s 56.3 Statement] ¶¶ 37–39.

Here, the printing component of the bands cannot be described as merely incidental to the bands' primary use.  Although the bands serve the utilitarian purpose of bundling multiple items together to be sold in a package, the printing component has the communicative purpose of advertising for the gaming store.  Indeed, the bands are imprinted with both the store's name and logo.  The color of the bands matches that of the store's logo, and the contrast of the black and white lettering against the red aligns with the logo and draws attention to the bands' message, further illustrating the marketing—and thus communicative—purpose behind the bands.  Such detail shows that the bands' printing component was designed not merely as a decorative feature but to communicate a very specific brand message.  The printing therefore is not merely incidental to the primary use of the article.

---

[13] These bands were ordered by [[                                                    ]], a video game accessory company based in California.  See Def.'s Ex. 13, Dec. 23, 2017, ECF No. 49-8; Def.'s 56.3 Statement ¶ 35.

[14] The store is [[              ]], and the bands are imprinted with the name [[            ]] and the phrase [[                          ]] in black and white lettering.  See Entry Diagrams [attached as Def.'s Ex. 3] at 17, Dec. 23, 2017, ECF No. 49-1.

### 4.  Production Order Q1320

Production Order Q1320 consists of maroon silicone bands that are 431.6 mm in circumference and 15.24 mm wide.  Id. ¶ 41.  The bands were ordered by an agricultural seed bank and seeding services company, which uses the bands to bind together its business brochures and documents in a neat and professional manner.[15]  Id. ¶¶ 40–43. The bands are imprinted with the company's web address, and the wording "Growing For Over 100 Years" in white lettering.  Entry Diagrams [attached as Def.'s Ex. 3] at 21, Dec. 23, 2017, ECF No. 49-1.

The printing component on these bands is not merely incidental to their primary use.  The bands convey the purchasing company's web address and its slogan, which alert users to the nature of the company's business and provide advertising for the brand. The bands again serve a dual purpose—to bind together business brochures and documents in a professional way and to convey information.  Nonetheless, the purchasing company chose to have the bands imprinted in a way that gave them a communicative purpose.  Users of the bands would know the name of the company and where to go to inquire about the company's services because of the printing.  The court cannot therefore say that the printing is merely incidental.

### 5.  Production Order Q1004

Production Order Q1004 consists of translucent silicone bands that are 215.5 mm in circumference and 15.2 mm wide.  Id. ¶ 45.  The bands were ordered by a supplier of

---

[15] The agricultural seed bank and seeding services company is [[                    ]] and is based in Idaho.  See Def.'s Ex. 15, Dec. 23, 2017, ECF No. 49-10.

printed and embroidered garments for the souvenir industry, which uses the bands to bind together a sweatshirt and a hat that are sold together.[16]  Id. [as clarified by Pl.'s 56.3 Statement] ¶¶ 44–46.   The bands are imprinted with one of the following size abbreviations—XXL, XL, L, M, or S—indicating the size of the sweatshirt so that customers need not pull the hat and sweatshirt combination apart to identify the sweatshirt's size, an issue the purchasing company previously encountered.   Berlin Testimony at 62–65; Def.'s 56.3 Statement [as clarified by Pl.'s 56.3 Statement] ¶ 46.

The printing component of these bands is not merely incidental to their primary use.   The customized bands have a communicative purpose—the bands contain a description of the sweatshirt's size so that customers do not have to pull the sweatshirt and hat apart to identify the sweatshirt's size.   Moreover, the information conveyed saves customers the hassle of taking apart the bundled products, saves employees the time they would have spent putting the sweatshirt and hat back together, and prevents confusion because the products remain bundled, thus reinforcing the message that the products are sold together.   Accordingly, with a communicative purpose, the printing component of the bands in Production Order Q1004 is not merely incidental to the primary use.

### 6.  Production Order Q2372

Production Order Q2372 consists of mustard-colored silicone bands that are 431.6 mm in circumference and 15.24 mm wide.  Def.'s 56.3 Statement ¶ 48.  The bands were

---

[16] The purchasing company is [[               ]].  See Def.'s Ex. 17, Dec. 23, 2017, ECF No. 49-12.

ordered by a restaurant, which uses them to hold its paper menu sheets to its wooden

menu boards, and to spruce up their menus generally.[17]  Id. [as clarified by Pl.'s 56.3

Statement] ¶¶ 47–49.  The bands are imprinted with the restaurant's name and logo, both

in brown.  See Entry Diagrams [attached as Def.'s Ex. 3] at 26, Dec. 23, 2017, ECF No.

49-1.

The printing component of these bands is not merely incidental.  The printing on

the bands serves the communicative purpose of advertising for the restaurant.  The

printing is customized to show the purchasing restaurant's name and logo in unique

colors.[18]  By including the restaurant's name and logo on the bands, the bands increase

brand awareness for the restaurant.  The branding component is bolstered by the fact

that the bands are removable and easily taken by customers.  The printing component is

therefore not merely incidental to the primary use.

### 7.  Production Order Q2287

Production Order Q2287 consists of purple silicone bands that are 403.9 mm in

circumference and 19 mm wide.  Def.'s 56.3 Statement ¶ 51.  The bands were ordered

---

[17]  The purchasing company is [[                                                                    ]], a restaurant in
Saskatchewan, Canada.  See Def.'s Ex. 20, Dec. 23, 2017, ECF No. 49-14.

[18]  The bands in Production Order Q2372 likely have decorative and utilitarian purposes, in addition
to a communicative purpose.  The bands are decorative because they "spruce up" the menu
board, and they are utilitarian because they hold the paper menu sheets to a wooden menu board.
Def.'s 56.3 Statement [as clarified by Pl.'s 56.3 Statement] ¶ 49.  The bands nevertheless have a
communicative purpose for the reasons mentioned, as well as the fact that the restaurant
deliberately selected bands that are easily removed from the boards.  Indeed, the restaurant found
it necessary to re-order 500 of the bands, suggesting that many customers removed the bands
and took them from the restaurant.  See Def.'s 56.3 Statement [as clarified by Pl.'s 56.3
Statement] ¶ 49; see also Berlin Testimony at 66 (noting that "[i]t's [the restaurant's] hope that
people will take the band off the menu board and take it with them.").  The bands thus serve an
advertising objective for the restaurant.

by an exercise equipment company, which sells the bands as an accessory to its foam roller product, claiming that the bands add grip to the foam roller during exercises.[19] Def.'s 56.3 Statement ¶¶ 50, 52.   The bands are imprinted with several names, descriptions, and logos relating to the product in white lettering, as well as "patent pending."[20]   Def.'s 56.3 Statement [as clarified by Pl.'s 56.3 Statement] ¶ 51; Entry Diagrams [attached as Def.'s Ex. 3] at 27, Dec. 23, 2017, ECF No. 49-1.  The bands help "reduce spinning out and slipping when you're doing exercise with a lot of rotational or sheer force."  Def.'s 56.3 Statement ¶ 53.

The printing component of these bands is not merely incidental to the bands' primary use.  The bands have a communicative purpose because they are imprinted with the product's unique name, as well as the words "patent pending."  Including the product's name serves advertising purposes as it communicates the brand message intended by the producer.  Further, "patent pending" serves a communicative purpose by conveying to the user and the public that the purchasing company is working to obtain a patent on the invention.  Although the bands certainly serve a utilitarian purpose—adding grip during exercise—the bands also have a communicative purpose that makes up part of their essence.  Accordingly, the printing component of the bands making up Production Order Q2287 is not merely incidental to the primary use of the goods.

---

[19] The purchasing company is [[                    ]], an exercise equipment company based in [[          ]].  <u>See</u> Def.'s Ex. 23, Dec. 23, 2017, ECF No. 49-17.

[20] The bands are imprinted with the names "[[          ]]" and "[[          ]]," and the phrase "[[          ]] patent pending."  <u>See</u> Entry Diagrams [attached as Def.'s Ex. 3] at 27, Dec. 23, 2017, ECF No. 49-1.

### 8.  Production Order Q3712

Production Order Q3712 consists of white silicon bands that are 596.9 mm in circumference and 31.75 mm wide.  Def.'s 56.3 Statement ¶ 55.  The bands were ordered by a luxury branding services company and used to bind together sales brochures, purchase information, and floor plan diagrams to aid in marketing a real estate client's luxury apartment tower.[21]  Def.'s 56.3 Statement ¶¶ 54–56.  The bands are imprinted with a number in debossed lettering signifying the address of the high-end apartment tower.[22]  Berlin Testimony at 79–82.

The printing component of these bands is merely incidental to their primary use.  The printing on the bands serves a decorative rather than communicative purpose.  The bands merely contain a number, and without greater context, it is not immediately discernible what the number signifies.  The bands do not alert holders of the bands to any brand, any event, any source for obtaining more information, or any instructions pertaining to a product.  Rather, the printing on these bands is designed to present the company's documents in a neat and professional manner.  Accordingly, the printing component is merely incidental to the primary use of the bands.

### 9.  Production Order Q3613

Production Order Q3613 consists of olive-colored silicone bands that are 376 mm in circumference and 12.7 mm wide.  Def.'s 56.3 Statement ¶ 59.  The bands were

---

[21] The purchasing company is [[                              ]], a luxury branding services company based in New York.  Def.'s Ex. 25, Dec. 23, 2017, ECF No. 51.

[22] The bands are imprinted with the number "[[          ]]" in debossed lettering.

ordered by a marketing and brand strategy firm and used to bind an 8.5" by 1/8" thick booklet.[23]  Id.  ¶¶ 58, 60.  The bands are imprinted with a nine-word description of a service-provider in white lettering.[24]  See Entry Diagrams [attached as Def.'s Ex. 3] at 37, Dec. 23, 2017, ECF No. 49-1.  The company also sought out bands in terra cotta or moss green color to compliment the booklet's design.  Def.'s 56.3 Statement ¶ 61.

The printing component of these bands is not merely incidental to the bands' primary use.  The bands serve a communicative purpose by describing the type of service provided by the provider in question.  Intuitively, the nine-word description of the service-provider is meant to be read.  The printing component serves to convey information to viewers of the bands, thus forming part of the essence of the bands.  Although the bands serve the utilitarian function of binding an informational booklet, they also serve a communicative purpose.  Accordingly, the printing component of the bands in Production Order Q3613 is not merely incidental to the primary use.

### 10. Production Order Q3695

Production Order Q3695 consists of red silicone bands that are 508 mm in circumference and 15.2 mm wide.  Def.'s 56.3 Statement ¶ 63.  The bands were ordered by a company that facilitates web-based Q&A forums, and used to securely close a 9" by 12" folder of recruiting documents and brochures that the company distributes during

---

[23] The purchasing company is [[                                        ]], a marketing and brand strategy firm based in New Hampshire.  Def.'s Ex. 27, Dec. 23, 2017, ECF No. 51-1.

[24] The bands read [[                                                                    ]].
Entry Diagrams [attached as Def.'s Ex. 3] at 37, Dec. 23, 2017, ECF No. 49-1.

recruiting trips.[25]  Id. ¶¶ 62–64.  The bands are imprinted with the web address of a related entity that assists companies in recruiting and hiring software programmers and developers.  See Def.'s Ex. 29, Dec. 23, 2017, ECF No. 51-3.[26]

The printing component of these bands is not merely incidental to the bands' primary use.  The bands serve a communicative purpose by conveying information in the form of the web address for the company's recruiting arm.  By clearly displaying the company's web address, the bands further the company's marketing and recruiting objectives.  The fact that the bands direct viewers where to find additional information underscores the bands' communicative purpose.  Accordingly, the printing component of these bands is not merely incidental to the primary use of the bands.

## CONCLUSION

Defendant's motion for summary judgment and Plaintiff's cross-motion for summary judgment are each granted in part and denied in part.  In accordance with the foregoing, it is

**ORDERED** that the products entered pursuant to production orders Q2201, P9427, P9938, Q1320, Q1004, Q2372, Q2287, Q3613, and Q3695 are properly classifiable under subheading 4911.99.80, HTSUS; and it is further

**ORDERED** that, with respect to the products entered pursuant to production orders Q2201, P9427, P9938, Q1320, Q1004, Q2372, Q2287, Q3613, and Q3695, Defendant's

---

[25] The purchasing company is [[                                    ]], based in New York City.  See Def.'s Ex. 28, Dec. 23, 2017, ECF No. 51-2.

[26] The bands are imprinted with the web address "[[                                    ]]" in white lettering.  See Entry Diagrams [attached as Def.'s Ex. 3] at 40, Dec. 23, 2017, ECF No. 49-1.

**PUBLIC VERSION**

summary judgment motion is denied and Plaintiff's cross-motion for summary judgment

is granted; and it is further

**ORDERED** that the products entered pursuant to Production Order Q3712 is

properly classifiable under subheading 3926.90.99, HTSUS; and it is further

**ORDERED** that, with respect to the products entered pursuant to Production Order

Q3712, Defendant's summary judgment motion is granted and Plaintiff's cross-motion for

summary judgment is denied.

Judgment will enter accordingly.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated: May 14, 2019
New York, New York